IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 04-62 |
| | : | |
| GORDON N. GREEN | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.   INTRODUCTION**

On February 11, 2004, an information was filed against Gordon Green charging him with one count of bribery relating to an employee benefit plan in the amount of $150,000, in violation of 18 U.S.C. § 1954, and one count of theft of employee benefit plan property, in violation of 18 U.S.C. § 664.  The charges arise from the defendant's theft of confidential labor hour reports in the possession of the Laborers International Union of North America pension fund and training fund and his attempted sale of these reports to a union contractor for a total payoff or bribe of $150,000.  Defendant Green entered a plea of guilty to the charges on March 9, 2004.

For the reasons explained in more detail below, the government respectfully recommends that the Court impose a sentence in this case that is below the guidelines range of imprisonment of 30-37 months based on the defendant's cooperation and assistance, but which includes at least some significant period of incarceration, community confinement or deprivation of liberty in recognition of the serious nature of the crimes.

**II.   FACTS**

The government agrees with the factual summary of the case that is contained in the Pre Sentence Investigation Report ("PSR").  See PSR, at ¶¶ 8-19.  The government also

respectfully refers the Court to the more detailed factual summary of the case that is set forth in the government's guilty plea memorandum.

### III.     SENTENCING GUIDELINES

#### A.     Maximum Penalties

The maximum possible penalties for these crimes are 8 years imprisonment, a $500,000 fine, 3 years supervised release, and a $200 special assessment.

#### B.     Calculation of Total Offense Level

The government agrees with the offense level calculation set forth in the Pre Sentence Investigation Report. (PSR, at ¶¶ 24-37). With a Criminal History Category of I and a Total Offense Level of 19, the guidelines range of imprisonment in this case is **30-37 months imprisonment**. (PSR, at ¶ 69).

In this case, as explained further below, the government has moved for a downward departure from the guidelines range of 30-37 months. However, the government's position is that the starting point for consideration of the extent of a downward departure should be based on this range, which fully reflects the seriousness and harmfulness of the defendant's criminal actions. Because significant rulings by the Supreme Court since the time that defendant Green entered his guilty plea in this case have created some question regarding the ongoing importance of the guidelines range established by the U.S. Sentencing Commission, the government respectfully submits the following analysis to demonstrate the importance of utilizing the sentencing guidelines range as a basis in formulating an appropriate sentence and as the starting point for considering the extent to which the Court should depart downward.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "unreasonableness." Id. at 765.

In the wake of Booker, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. As is plainly set forth in Booker, the Guidelines sentence is not to be based solely on facts found by a jury beyond a reasonable doubt. See United States v. Crosby, 397 F.3d 103, 115 (2d Cir. 2005) ("a sentencing judge would * * * violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court."); see also United States v. Mares, 2005 WL 503715, at *7 (5th Cir. Mar. 4, 2005) (Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing. The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline

3

sentencing range and all facts relevant to the determination of a non-Guidelines sentence.").[1] Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767; see also United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("[t]he applicable Guidelines range is normally to be determined in the same manner as before Booker/Fanfan.").[2]

---

[1] The Ninth Circuit in United States v. Ameline, 2005 WL 350811, at *7 n.7 (9th Cir. Feb. 10, 2005), left open the question of whether the remedial opinion in Booker affects the standard of proof under the Sentencing Guidelines. The government strongly believes that the standard of proof remains the same after Booker as it was before. See Mares, 2005 WL 503715, at *7 ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."); Crosby, 397 F.3d at 112 ("The applicable Guidelines range is normally to be determined in the same manner as before Booker/Fanfan. Moreover, * * * the [Supreme] Court in its Remedy Opinion contemplates that, with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection.").

[2] The courts of appeals have generally stated that the proper sentencing procedure after Booker is for the district court first to calculate the Guidelines sentence and then to consider the other factors listed in 18 U.S.C. § 3553(a). See, e.g., Crosby, 397 F.3d at 111, 112 ("In order to fulfill this statutory duty to "consider" the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range. * * * . Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a)."); United States v. Hughes, 396 F.3d 374, 378-79 (4th Cir. 2005) ("Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."). As noted below, the government submits that the factors in Section 3553(a) have, to a large extent, been taken into account by the Sentencing Commission in its development of the Sentencing Guidelines, and that even a separate accounting of these factors should, in all but the most exceptional case, result in a sentence within the Guidelines range. Cf. Mares, 2005 WL 503715 at *7 (noting that if a sentencing judge exercises discretion to impose a sentence within the Guidelines range, the appellate court on review "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines" and it will be "rare" for a reviewing court to say the sentence is unreasonable).

4

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 744 (same) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of nearly 20 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. Since Booker, the courts of appeals have emphasized the continued importance of the Sentencing Guidelines. As the Second Circuit Court of Appeals explained in United States v. Crosby, "These principles change the Guidelines from being mandatory to being advisory, but it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Crosby, 397 F.3d at 113. The Court of Appeals for the Fifth Circuit also noted in Mares, "Even in the discretionary sentencing system established by Booker/Fanfan, a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity." 2005 WL 503715 at *6. The Fourth Circuit, in United States v. Hughes, 396 F.3d 374 (4th Cir. 2005), reminded district court judges of their continuing obligation after Booker to explain sentences imposed outside of the Guidelines range. "If the court imposes a sentence outside the guideline range, it should

explain its reasons for doing so.  Even the dissent in Booker, uncontradicted by the opinion of the Court, acknowledged the 'surviving requirement that the court set forth "the specific reason for the imposition of a sentence different from that described" in the Guidelines.'  Booker, Dissenting Opinion of Justice Scalia at 3 (quoting 18 U.S.C.A. § 3553(c)(2)).  This requirement, from § 3553(c)(2), was not excised by Booker, and it continues to govern sentencing courts." Id. at 379 & n.4; see also United States v. Paladino, 2005 WL 435430, at *6 (7th Cir. Feb. 25, 2005) ("Under the new sentencing regime the judge must justify departing from the guidelines, and the justification has to be reasonable.").

   The government commends to the Court's attention the scholarly opinion in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005), which agreed that, absent unusual circumstances, a sentence should be imposed within the Sentencing Guidelines range.  In his assessment in Wilson, on the day after Booker was decided, Judge Cassell explained at length the reasons supporting this view.  As he stated, the Guidelines represent the product of an expert commission, which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences which carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to Congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will

only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912.[3]

The United States submits that a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. As the Fifth Circuit stated in Mares,

> If the sentencing judge exercises her discretion to impose a sentence within a properly calculated Guideline range, in our reasonableness review we will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines. Given the deference due the sentencing judge's discretion under the Booker/Fanfan regime, it will be rare for a reviewing court to say such a sentence is "unreasonable."

2005 WL 503715 at *7. The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate. Cf. id. (noting that "[w]hen the judge exercises her discretion to impose a sentence within the Guideline range and states for the record that she is doing so, little explanation is required" but when the judge gives a non-Guideline sentence, "she should carefully articulate the reasons she concludes that the sentence she has selected is appropriate for that defendant"

---

[3] In United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005), Judge Adelman rejected Judge Cassell's approach, claiming that it is "inconsistent" with the holdings in Booker. The government respectfully disagrees with Judge Adelman's approach. As Judge Cassell noted in a subsequent opinion in United States v. Wilson, 2005 WL 273168 (D. Utah Feb. 2, 2005), the Ranum approach ignores the "carefully calibrated" work of the Commission in determining which offender characteristics determine a sentence. Id. at *5. Moreover, Ranum gives insufficient consideration to the importance of consistent sentencing and avoiding sentencing disparities. As Judge Cassell recognized, "only close adherence to the Guidelines offers any prospect of treating similarly-situated offenders equally," and thus assuring fidelity to the manifest Congressional purpose. Id.

because "[s]uch reasons are essential to permit this court to review the sentence for reasonableness as directed by Booker.")

        **C.**    **Government's Downward Departure Motion Pursuant to § 5K1.1**

The government has filed a downward departure motion pursuant to U.S.S.G. § 5K1.1 based on the defendant's cooperation and assistance in this investigation and prosecution. A summary of the defendant's cooperation is contained in the government's memorandum in support of its motion for downward departure, which is filed separately and under seal. For the reasons stated in that memorandum, the government is recommending that the Court depart below the sentencing guidelines range in this case.

**IV.**    **GOVERNMENT'S SENTENCING RECOMMENDATION**

Defendant Gordon Green's criminal actions demonstrate both an astonishing breach of the trust placed in him by the Laborers International Union of North America and an intolerable example of corruption and greed. As the director of the Service Contract Education and Training Trust Fund of the Laborers International Union of North America ("LIUNA"), defendant Green had important responsibilities. By virtue of the office he held, he was empowered to help others and was expected to safeguard union property and confidential information. His employer and the thousands of union members whose interests he was hired to advance and protect trusted him and expected that he would not attempt to profit from the theft of union property and sale of it to a union employer. By selling confidential union contract information to an employer of LIUNA members for a total price of $150,000, Green not only sold out his union and disgraced himself, but also attempted to corrupt the entire bidding process that results in the award of government facilities maintenance contracts across the United States.

By handing over 144 pension fund labor hour contract reports for a suitcase full of cash, Green recognized and knew full well that his actions would corrupt a government contract bidding process that is designed to be fair to bidders and to the government. The confidential information that Green sold would have provided the employer bidding on government contracts with a tremendous – and unfair – advantage in pursuing government contracts. Armed with the pension fund labor hour contract reports, an employer would have the information it needed to know exactly how much to bid to win a government contract from a competitor without bidding an amount lower than necessary.

Corruption takes on many forms and imposes a hidden tax on society. It is often invisible and is always extremely difficult to detect, investigate and successfully prosecute without assistance from honest citizens who are willing to come forward and assist the government. The facts of this case confirm these truths. Gordon Green approached a government contractor in Doylestown, Pennsylvania with whom he was familiar and comfortable, and whom he was confident he could enlist in his corrupt scheme. Green seriously misjudged the situation. Rather than participate in the illegal scheme that Green had proposed, this employer instead notified federal authorities, who moved quickly to investigate and put a stop to Green's illegal plan. Thus, if not for the actions of an honest citizen who knew that what Green had proposed was unlawful and who was brave enough to report it to federal authorities and then participate in the investigation in an undercover capacity, Gordon Green would likely have succeeded in his plan.

Corruption such as that evidenced by defendant Green's actions also causes societal harm that cannot easily be measured or characterized. Because it is often so difficult to

root out and prosecute corrupt officials who, like Gordon Green, solicit bribes, accept payoffs, and steal union property, when such actions are uncovered and brought to justice they must be recognized for how harmful they are. Those who, as defendant Green did here, would steal confidential information and sell it as part of a scheme to corrupt an entire government contracting process deserve a special place in the annals of union corruption infamy.

In addressing the question of an appropriate sentence in this case, there are two significant factors that the government believes are paramount. First, defendant Green must be punished appropriately for his brazen and extremely serious criminal actions. While it will surely be argued at sentencing that Green has already been punished by the loss of his job and the public disgrace that the criminal charges in this case have brought upon him and his family, the law already considers and takes those factors into account and nonetheless provides that criminal actions of the type witnessed here call for a prison sentence of between two and one-half and three years.

Second, deterrence is a factor that is equally as important as punishment. The sentence imposed in this case will send a message to others in society who would commit crimes similar to those of Gordon Green. The crucial issue is what that message will be. The government strongly believes that the Court should impose a sentence that sends an appropriately strong, loud and clear message to society that the solicitation of kickbacks, the acceptance of bribes and the theft of union property by union officials will not be tolerated by society and will be prosecuted and punished whenever it occurs. It is difficult to understate how important deterrence is in a case such as this one.

Perhaps in immediate recognition of the wrongfulness of his actions and the lengthy sentence he now faces in this case in the absence of a downward departure motion, and in view of the overwhelming strength of the evidence against him, defendant Green cooperated with and assisted the government in several criminal investigations. As a result of these efforts, which are outlined in a memorandum that the government has filed under seal, the government has filed a downward departure motion and has asked the Court to impose a sentence that is below the guidelines range of 30 to 37 months. The question, therefore, is the extent to which the Court should depart downward in recognition of both the aggravating and mitigating factors that apply in this case.

Based on all of the considerations outlined in this memorandum and those that the government will argue at the time of sentencing, in the government's view, in order to accomplish the objectives of the sentencing process, which include punishing and rehabilitating offenders, deterring others from committing similar crimes, and protecting society, a sentence that includes some significant period of imprisonment, community confinement or other deprivation of liberty, or combination of same, is both necessary and just. Probation is not an appropriate or sufficient sentence in this case. The government also respectfully requests that the

Court impose a 3 year period of supervised release and order that defendant Green pay a fine at or near the high end of the fine range of $6,000 to $60,000.

        Respectfully submitted,

        PATRICK L. MEEHAN
        United States Attorney


        _____
        MICHAEL A. SCHWARTZ
        Assistant United States Attorney
        Section Chief


        _____
        JOHN J. PEASE
        Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing was served by U.S. mail to counsel for the defendant and by messenger to the Probation Officer:

> Steven F. Wrobel, Esquire
> Martin, Snyder & Bernstein, P.A.
> 217 E. Redwood Street, Suite 2000
> Baltimore, Maryland 21202

> U.S.P.O. Sandra Luehrs-Shaw
> United States Probation Office
> 2400 William Green Federal Building
> 600 Arch Street
> Philadelphia, PA 19106

> _____
> JOHN J. PEASE
> Assistant United States Attorney

Date: _____